UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| KEVIN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-CV-59-B-W |
| | ) | |
| HARTT TRANSPORTATION | ) | |
| SYSTEMS INC., | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kevin Brown has sued his former employer, Defendant Hartt Transportation

Systems Inc., alleging violations of the Family Medical Leave Act, the Americans with

Disabilities Act, the Rehabilitation Act, the Maine Human Rights Act, and the Maine Family

Medical Leave Requirements. Brown's claims are premised on a demotion and termination

following his return from leave associated with a heart condition. Brown also alleges a violation

of Section 631 of the Maine Employment Practices Act based on Hartt Transportation's alleged

failure to produce his entire employment record on request. Hartt Transportation has filed a

motion for summary judgment against all claims except the claim arising under the Maine

Employment Practices Act. Brown opposes the motion, but concedes that judgment should enter

against the Rehabilitation Act claim. The Court referred the motion for report and

recommendation pursuant to 28 U.S.C. § 636. I recommend that the Court deny the motion

except in regard to the request for judgment on the Rehabilitation Act claim.

## FACTS

The following factual recitation is drawn from the parties' statements of material fact submitted and construed in accordance with District of Maine Local Rule 56. The underlying statements are found in the Defendant's Statement of Material Facts ("DSMF," Doc. No. 23), the Plaintiff's Opposing Statement ("POS," Doc. No. 43), the Plaintiff's Additional Statement ("PAS," also Doc. No. 43), and the Defendant's Reply Statement ("DRS," Doc. No. 46). Because Kevin Brown is the party opposing the summary judgment motion, where disputes exist as to the proper characterization of "the facts," the following recitation states the facts in the manner that favors Brown, provided he has cited evidentiary support for his version of events.

*Defendant's Statement[1] and Plaintiff's Opposing Statement*

Hartt Transportation Inc. hired Kevin Brown in September 2001. In July 2003, Mr. Brown received a promotion to the position of Sales Manager. As Sales Manager, Mr. Brown reported to Jeffrey Castonguay, Hartt's General Manager. During Mr. Brown's employment,

---

[1]       Hartt's counsel has violated the Local Rules with respect to the filing of the summary judgment record. Section (j) of the Administrative Procedures Governing the Filing and Service by Electronic Means (Appendix IV of the Local Rules) states: "Attachments to filings and exhibits must be filed in accordance with the Court's ECF User Manual, unless otherwise ordered by the court." Page 35 of the User Manual states: "Each referenced exhibit must be labeled with a proper exhibit marking, filed as a separate attachment, and fully described as shown on page 33." Page 33 states: "*Counsel must* describe the attachment fully by clicking in the Description box and typing a clear and concise description of the attachment, as shown above." Hartt's counsel has violated the rule by simply labeling several summary judgment exhibits as attachments A though I without any further description. This violation requires the Court to sift the record in search of documents contrary to the intent of Local Rule 56(f) ("The court shall have no independent duty to search or consider any part of the record not *specifically referenced* in the parties' separate statement of facts.") (emphasis added). The Court should not have to make up its own exhibit reference list or jump about within a statement of facts to recall whether, for example, the Castonguay Deposition is exhibit B or C (it is found in both exhibits B and G, as it happens).

        In particular, Exhibit I, which consists of deposition exhibits, is filed in 39 parts running approximately 1000 pages. Hartt's motion does not require that the Court review even a tenth of these pages. Beyond the problem of efficiently navigating this exhibit, it is difficult to understand why most of it is even on the docket. Section (j)(3) of the Administrative Procedures Governing the Filing and Service by Electronic Means states: "A filing user must submit as attachments only those excerpts of the referenced documents that are directly germane to the matter under consideration by the court." Exhibit I egregiously violates this rule. I have done what needs to be done to put together this statement of facts, but I mention these violations in hope that this footnote will be read and others will heed my warning.

William Hartt was president of the company.  Rick Parisien was Hartt's human resource safety director.  In November 2005, Hartt hired Dan Michaud as a salesperson.  In this position Mr. Michaud reported to Mr. Brown.  Mr. Castonguay directed that the sales accounts be divided between Mr. Brown and Mr. Michaud.  The men worked as a sales team and Mr. Michaud had discretion with respect to the conduct of his workday, though Mr. Brown held the management title and avers that he held extra responsibility as a result.  (DSMF ¶¶ 1-10, 13;  POS ¶¶ 8-10.)

On November 3, 2006, Mr. Brown had a heart attack.  This heart attack was followed by another on December 3, 2006.  Mr. Brown took medical leave from work commencing November 6 and continuing through January 22, 2007.  While Brown was on leave, Hartt supplemented his short-term disability payments by paying the difference between that benefit and Brown's salary until Brown announced his intention of returning to work.  However, while Brown was on medical leave, Mr. Hartt and Mr. Castonguay promoted Michaud to the position of Director of Sales, effective January 2007.  (DSMF ¶¶ 28-32;  POS ¶ 30.)  Mr. Castonguay determined that, if Mr. Brown returned to work, he would thenceforth report to Mr. Michaud. (DSMF ¶¶ 34, 50.)

Mr. Brown dropped by Hartt's business office on January 15, 2007.  As of that date, Mr. Brown's primary care physician, Dr. Bruehl, had not yet cleared Mr. Brown to return to work and Brown did not know when he would be ready to return.  (Id. ¶¶ 41, 44-45, 48.)  During his visit to the office, Brown learned from Mr. Michaud that Michaud had taken the role of Director of Sales and that Brown would be filling the role of salesperson going forward.  (Id. ¶¶ 27, 36-38, 41.)  Brown told Michaud that he might take the position, but not without "a court battle."  (Id. ¶ 39;  POS ¶ 39.)  Brown also met with Mr. Castonguay on January 15.  (DSMF ¶ 40.) Castonguay told Brown to take as much short term disability leave as he needed and that, if he

3

returned to work, he would have a job in sales reporting to Michaud with the same salary and benefits he previously had.  (Id. ¶¶ 49-51.)  Castonguay did not mention any quality of work problems to Mr. Brown during their discussion on January 15.  (Id. ¶ 47.)

On January 17, 2007, Dr. Bruehl prepared a return-to-work slip for Mr. Brown.  Dr. Bruehl did not impose any restrictions, understanding that Brown was returning to an office/desk job.  (Id. ¶¶ 52-54;  POS ¶¶ 53-54, 56.)  It is undisputed that Mr. Brown did not require or request any accommodation to perform his duties as a member of the sales department.  (DSMF ¶¶ 57-58;  POS ¶¶ 57-58.)  He did request periodic leave to attend physical therapy thrice weekly.  (POS ¶ 59.)

A few days after the January 15 visit to the office, Mr. Brown met with Mr. Hartt.  At that meeting, Hartt told Brown that the company had not been happy with Brown's work performance and that the company had received a couple of customer complaints about Brown. (DSMF ¶¶ 61-62;  POS ¶ 62.)

Mr. Brown returned to work on January 22, 2007.  On his first day back to work, Brown met with Castonguay and Michaud.  (DSMF ¶ 64.)  Castonguay and Michaud instructed Brown to concentrate his efforts on the Company's flatbed freight business.  The decision to direct Brown's work efforts toward this line of work was made sometime between January 18 and 22 by Mr. Castonguay and Mr. Hartt.  (Id. ¶¶ 66-67, 70.)  According to Mr. Castonguay, Brown's biggest talent was to go in and obtain very detailed information from customers that would enable Hartt to capture freight business.  (Id. ¶ 65.)  Castonguay and Michaud instructed Brown to get information from flatbed customers and pay personal visits to flatbed customers identified, in part, on a specific list.  (Id. ¶ 71.)  Within a day following his return to work, Brown was provided with a computer and was given access to the Company's instant messaging system.

4

(Id. ¶ 72.)  Mr. Brown's pay, benefits, and expense account were unchanged.  (Id. ¶¶ 60, 63;

POS ¶ 60.)  However, both status within the office and the assignment of sales accounts had

changed, as Michaud was now the director of sales and Brown was being directed to develop

sales accounts in the flatbed freight portion of Hartt's business.  (DSMF ¶ 35;  POS ¶ 35.)

Mr. Castonguay has testified that his expectations for Mr. Brown focused on the quality

of information he would generate from potential customers that could grow the Company's

flatbed business.  (DSMF ¶ 68.)  Brown denies this statement based on the fact that he was

expected to make 5 or 6 flatbed calls per day.  (POS ¶ 68.)  The parties agree that Brown was

expected to make 5 or 6 "face-to-face" sales calls per day.  (DSMF ¶ 83.)  In Brown's view, this

was an unreasonable expectation.  (Id. ¶ 93.)  On January 26, 2007, at the end of his first week

back, Brown had a discussion with Michaud in which Brown expressed concerns about the sales

calls he was expected to make.  In particular, he indicated that the number of calls he was

making was limiting the quality of the calls.  (Id. ¶ 92;  POS ¶ 92.)  During that week, Michaud

gave Brown and other sales employees a document identifying the types of information he

wanted them to provide in connection with sales calls.[2]  (DSMF ¶ 94.)

Hartt offers several statements to the effect that Mr. Brown's post-return sales work was

below satisfactory in terms of the number of sales calls Brown made and the quality of the

information he obtained.  Hartt offers these statements to explain its decision to terminate

Brown's employment three weeks after his return.  Most of the statements are denied.  These

disputes are described in the following paragraphs.

---

[2]     The document is identified as Exhibit 64 and should be found in Exhibit I.  Based on the list of deposition
exhibits found at the beginning of docket item 28 and my rummaging through Exhibit I, Exhibit 64 should be found
between docket item 28-4 (which ends with Exhibit 56) and docket item 29-4 (which begins with Exhibit 74), but it
cannot be found there.

On one day in January 2007, Mr. Brown attended a landscaping show in Portland with exhibitors, which would have included some potential flatbed customers.  There were a number of exhibitors at the show and Mr. Brown spent an afternoon or part of an afternoon at the show. Brown recalls making "a half dozen good contacts" at the show.  (Id. ¶¶ 77-79.)  Hartt offers a statement that Brown only provided Mr. Michaud with one business card after the show when asked what contacts he made.  (Id. ¶ 80.)  In opposition, Brown denies the statement and reports that he provided Michaud with 5 or 6 business cards.  This denial is supported by his affidavit. (POS ¶ 80;  Brown Aff. ¶ 9, Doc. No. 44.)  Hartt states that Michaud was extremely disappointed, but that statement is premised on the assertion that Brown only supplied a single business card.  Additionally, Brown avers that Michaud never expressed that disappointment to him.  (DSMF ¶ 81;  POS ¶ 81.)  Hartt states that Mr. Castonguay was "amazed" that little benefit came from Brown's attendance at the show, but Brown says he was given tickets by a customer, that neither he nor Michaud had previously attended the show, and that he did not realize that the show was geared toward hobbyists and small-scale landscapers rather than landscapers who might transport large loads.  (DSMF ¶ 82;  POS ¶ 82.)

In his deposition testimony, Mr. Castonguay stated that he felt, as of sometime between February 2 and February 5, that Mr. Brown was not exerting himself and was failing to deliver on his "marching orders to develop information," returning only limited information on two calls made in two of the work days during Brown's second week back.  The parties mutually acknowledge that Brown provided Michaud with a report concerning his sales calls during his second week back.[3]  (DSMF ¶ 88;  Castonguay Cont'd Dep. at 276, Doc. No. 27-3.)  Brown also

---

[3]     Mr. Brown submitted a report to Michaud identified as Exhibit 58.  (DSMF ¶¶ 87-88.)  If the report is in Hartt's summary judgment Exhibit I, it would seem that it was filed out of order.  Hartt also offers some testimony

provided Michaud with a report of the sales calls he made during his third week back.[4] (DSMF ¶ 90.) Castonguay discussed Brown's performance with Mr. Hartt following Brown's return to work and expressed the view that Brown's demeanor, attitude problems and actions indicated that "he did not want to be there." (Id. ¶¶ 91, 96.)

On February 12, 2007, Mr. Michaud finished a report for Mr. Castonguay that summarized his activities from the date he returned to work. (Id. ¶ 95; POS ¶ 95.) On that same date, Michaud informed Mr. Brown that he was terminated. (DSMF ¶ 97.) The decision was supported by Castonguay and by Mr. Hartt. (Id. ¶¶ 97-98.) Mr. Hartt testified at his deposition that he supported the decision due to Brown's "lack of performance, lack of sales, lack of producing." (Id. ¶ 98.) According to him, he based his assessment on what was reported by Castonguay.[5] (Id. ¶ 99; POS ¶ 99.)

No one at Hartt ever said to Mr. Brown and Brown never overheard anyone saying that he was terminated because Hartt was concerned about the future medical costs it would incur on account of his health status. Nor did Brown ever see any document that suggested the possibility. (DSMF ¶¶ 103-105.)

---

from Mr. Castonguay concerning statements made to him by Mr. Michaud about Mr. Brown's attitude, but Hartt fails to respond to Mr. Brown's hearsay objection. (DSMF ¶ 89.)

[4]    The week 3 report is identified as Exhibit 44. (Doc. No. 28-4 at 7.)

[5]    Hartt relates what Mr. Michaud purportedly told Mr. Brown at their termination meeting. I have sustained a hearsay objection because Hartt cited Mr. Castonguay's deposition and Mr. Castonguay was not present. Hartt's effort to remedy this mistake in its reply, by citing the transcript of Michaud's continued deposition, is improper. (DSMF ¶ 100; POS ¶ 100; DRS ¶ 100.) In any event, Hartt's statement must give way to Brown's description of what was said to him, which is described in the context of Plaintiff's Additional Statement. (PAS ¶ 116.) Hartt also states that Michaud provided Brown with a termination letter, citing Michaud's continued deposition transcript. In fact, Michaud testified that Brown did not receive a termination letter. (DSMF ¶ 101; POS ¶ 101; Michaud Cont'd Dep. at 61, Doc. No. 27-4.) There is a written memorandum to Castonguay from Michaud, identified as Exhibit 46, in which Michaud reported that he "instructed Kevin the reason for his dismissal was attributed to his poor quality of work, lack of proper follow through, and disregard for following proper procedure." (Doc. No. 28-4 at 9.)

In its Statement, Hartt offers a series of assertions to suggest that Mr. Michaud's ascent to Director of Sales was essentially determined prior to Mr. Brown's leave. These statements lead to a swearing contest between Mr. Brown and Mr. Michaud. Michaud testified that in 2006 he was requested to process many action items that were previously performed by Brown and that Michaud felt that he was doing a disproportionate amount of action items in comparison to Brown, feeling overburdened and overwhelmed at times. (DSMF ¶ 17-18.) Brown testified that they allocated the accounts and the work fairly and that they each worked half of the accounts. (POS ¶¶ 17-18.) Mr. Hartt testified that he had the perception that Brown was pushing work over to Michaud and that Michaud was responsible for most of the customers at one point in 2006, prior to Brown's heart attacks. (DSMF ¶ 20.) At some unspecified time, Brown had a conversation with Mr. Castonguay about a conflict Brown had with a colleague in Hartt's brokerage department. (Id. ¶ 21.) At another unspecified point in time Castonguay asked Brown about his efforts to increase back haul business from New York and New Jersey into New England. (Id. ¶ 22.)

Mr. Castonguay and Mr. Hartt have testified that they discussed restructuring the sales department and replacing Mr. Brown prior to his heart attack. (Id. ¶¶ 23-24.)

*Plaintiff's Additional Statement and Defendant's Reply Statement*

At the time of Brown's demotion and termination, Hartt's written FMLA policy did not provide for reinstatement, contrary to federal law. (PAS ¶ 2.) Hartt claims that it informs employees about their right to FMLA leave at their orientation, though its orientation agenda says nothing concerning FMLA leave. (Id. ¶¶ 3-4.) Brown maintains that the right to take FMLA leave was not discussed at his orientation and that he never received any policy concerning FMLA leave from Hartt other than a form in his handbook about medical leave. (Id.

8

¶ 5.)  Brown also avers that he was never informed about FMLA leave and had never heard of it when he took leave for his heart attack.  (<u>Id.</u> ¶ 6.)  According to Brown's sworn declaration, nobody at Hartt ever informed him about his right to reinstatement to his pre-heart attack position.  (<u>Id.</u> ¶ 7.)  Hartt denies this statement with a citation to Brown's deposition transcript, but the cited passage reflects only that Jeff Castonguay told Brown he would have a job in sales reporting to Dan Michaud when he returned to work.  (DRS ¶ 7;  Brown Dep. at 233-34, Doc. No. 24-3.)

Brown states, and Hartt admits, that Hartt terminated fourteen employees from February 22, 2005, to September 1, 2007, for exhaustion of FMLA leave.  (PAS ¶ 8.)  However, Hartt objects and argues that the fact is not material because it cannot support any inference in favor of Brown, as "[t]here is nothing in the discovery record indicating that any of the persons identified were deprived of their rights . . ., only that these persons separated from employment . . . following their exhaustion of their family and medical leave."  (DRS ¶ 8.)  Because there is insufficient evidence in the record, I am not persuaded that this basic fact calls for an inference that there is a pattern of terminating employees with family medical concerns.[6]  Brown argues in his surreply that this evidence merely explains why he was reluctant to remain out on leave as long as he might have.  Brown also argues that the fact explains why Castonguay encouraged him to remain out on leave as long as short term disability benefits were available, because that would have carried him beyond the limit of FMLA leave.  (Pl.'s Surreply ¶ 8, Doc. No. 48.)  I overrule the objection and will treat this fact as something that could be considered in

---

[6]      Local Rule 56(e) indicates that a party should include in a responsive statement that the statement of fact "should be stricken."  Hartt merely recites an objection without requesting that the fact be stricken, another deviation from Local Rule 56 practice.

conjunction with the fact that Castonguay allegedly encouraged Brown to remain out for the duration of his short-term disability benefits.

Neither Mr. Castonguay nor Mr. Hartt had much awareness of any particulars concerning Hartt's nondiscrimination policy.  Mr. Castonguay was aware that there was a nondiscrimination policy, but without being shown evidence of a written policy that was in place when Mr. Brown was an employee, Mr. Castonguay would not acknowledge that the written policy in place when Brown was terminated prohibited discrimination based on handicap.  (PAS ¶ 9;  Castonguay Dep. 223:5-225:10, Doc. No. 25-2.)  Mr. Hartt admitted he was not familiar with the written policy, but stated that he understood that it is unlawful to discriminate on the basis of disabilities.  (PAS ¶ 10.)  I overrule Hartt's objection that Mr. Hartt's relative awareness of the content of the written policy is immaterial.  However, I do not make any inferential finding that he must have discriminated on the basis of disability simply because he was not familiar with the language of the written policy.

Mr. Brown attests that no one at Hartt expressed any concerns or complaints to him about his job performance prior to his heart attack.  (Id. ¶ 11.)  I accept this as true for purposes of summary judgment, though it is denied by Hartt.  There has been an admission by Brown that Mr. Castonguay spoke to him about a conflict with someone in brokerage, but the underlying statement does not relate that Brown was at fault for the conflict or that he received any criticism from Castonguay.  (DSMF ¶ 21.)

During the period of time that Brown served as Director of Sales, Hartt's revenues grew annually.  (PAS ¶ 12.)  I overrule an objection that this statement is immaterial.  During the period of time that Brown worked with only one other person in Sales (a Mr. Rideout), Hartt's fleet increased from 120 tractors to 350, and from 300 trailers to 900.  Brown's testimony is to

10

the effect that these increases were due to a team effort, but relates that they happened while there were only two persons working sales (not including Mr. Michaud).  (Id. ¶ 13;  Brown Dep. at 52-53, Doc. No. 23-3.)  I overrule another materiality objection.

According to Brown, he was responsible for bringing in Wal-Mart as a customer and was awarded use of a new company car for bringing that account in.  (PAS ¶¶ 14-15.)  I credit this testimony for purposes of summary judgment and overrule Hartt's materiality objections.  I similarly credit the following statements concerning Brown's work for Hartt and overrule materiality objections to each:

> Brown successfully negotiated a contract with Flakeboard;
>
> Brown developed, directed, and implemented company policy with regard to international freight, an area of business that Hartt did not participate in before Brown's tenure at the company;
>
> As of 2006, Brown was the salesperson responsible for the Poland Springs account;
>
> Brown handled the Georgia-Pacific, Lowe's, New Page, Louisiana-Pacific, William T. Burnett, NYK, and Sysco accounts;
>
> Brown shared the SAPPI account;
>
> Brown received a $6,000 raise within 9-10 months of starting work at Hartt;
>
> Brown was given a $10,000 raise in October of 2004 because he was doing a good job as Sales Manager;
>
> In February of 2006, Mr. Brown received a $109.61-per-week raise from $1415.39 to $1525;
>
> In June 2006, Castonguay told Brown that during the period Brown served as Director of Sales, Hartt was growing at 20-25% profitability.  Brown does not take full credit, obviously, but feels he contributed to that growth.

(Id. ¶¶ 16-23.)

Regarding the conditions of his employment, Mr. Brown relates that Hartt failed to provide him with a laptop, unlike Mr. Michaud, even while Brown was the Director of Sales.  He also relates that his desktop computer could not print an Excel spreadsheet.  (Id. ¶¶ 24-25.) These statements reflect conditions as they existed prior to Brown's heart attacks as well as after, so it is not apparent that they demonstrate any retaliatory or discriminatory animus.  However, the computer facts explain why Brown would, at times, forward emails with Excel attachments to Michaud and why he would at times have Michaud enter information into an Excel format. (Id. ¶¶ 26-27.)  On the topic of relative work load, Michaud does not recall having any conversation, subsequent to June 2006, in which he commented or complained to Mr. Castonguay that his workload was too heavy or unfair compared to that being handled by Brown. (Id. ¶ 28.)

Mr. Brown's Additional Statement relates that the first heart attack on November 3, 2006, required quintuple bypass surgery plus an angioplasty.  There was a second heart attack on December 3, 2006.  Mr. Brown experienced a period of heart pain resulting in another angioplasty procedure around Christmas 2006.  Mr. Brown was hospitalized on three occasions. He took medical leave from November 6, 2006, through January 22, 2007.  (Id. ¶¶ 29-32.)

Brown asserts that his hospitalizations cost Hartt $188,000.  (Id. ¶ 33, citing HARTT 000795, Doc. No. 43-1.)  The cited document is titled Diversified Admin. Corp Paid Claims Analysis and is dated April 3, 2007.  Mr. Brown's name does not appear anywhere on the document, but the documents reflects that an enrollee had "total claims charges" of $188,159.81 for claims incurred during the period of Brown's absence on leave.  The document reflects a corresponding amount paid of $91,591.44.  Hartt objects to the statement on the ground that the document in question is hearsay, asserting that the document has "never been introduced through

any credible witness" and that "nothing in the discovery record is sufficient to establish its admissibility." (DRS ¶ 33.) In his next statement, Mr. Brown relates that Hartt is self-insured for purposes of medical insurance. (PAS ¶ 34.) Hartt qualifies this statement and cites the Declaration of Joanna Bradeen, who avers that Hartt is self-insured up to $40,000 per covered individual. (DRS ¶ 34; Bradeen Decl. ¶ 6, Doc. No. 46-1.) In her Declaration, Ms. Bradeen states that she has reviewed the document HARTT 000795, that Diversified Administration Corporation is Hartt's third-party insurance administrator, and that the document does not reflect payments by Hartt in the amount of $188,000. (Bradeen Decl. ¶ 3.) She does not deny the authenticity of the document, but explains that Hartt paid only $40,519.11 in connection with Brown's medical care. (Id. ¶ 4.) Mr. Brown is satisfied if the record reflects that his heart attack cost Hartt $40,000, which is what I find based on this record. (Pl.'s Surreply ¶ 33, Doc. No. 48.)

According to Mr. Brown, Mr. Castonguay told him that when someone has a serious medical condition it costs Hartt a lot of money. (PAS ¶ 35.) Hartt denies this statement with an affidavit from Castonguay. For purposes of summary judgment, Brown's testimony is credited. Hartt argues that this testimony cannot be credited because Brown previously testified at his deposition that no one at Hartt ever said he was terminated because of medical costs related to his health. It is true that Brown so testified. However, Brown also testified at his deposition that Castonguay told him that employee medical conditions cost the company a lot of money. (Brown Dep. at 240:8-23.) These two statements are not inconsistent and can both be credited for summary judgment purposes.

Prior to Mr. Brown's heart attack, Mr. Castonguay never discussed with Brown the possibility of replacing Brown or restructuring the Sales Department. (PAS ¶ 36.) At his initial deposition, Castonguay testified that he had some informal discussions with Mr. Hartt about

13

replacing Brown or restructuring the sales department, that these discussions occurred
"[p]robably late August and then they intensified as the year continued," and that there is no
written record of any such conversations.  (Id. ¶ 37;  Castonguay Dep. at 166:5-22, Doc. No. 25-
1.)

Brown states:  "When Brown requested a copy of his personnel file on March 1, 2007,
Hartt failed to provide him with memoranda for October 2005, November 2005, week of June
10, 2006, week of August 26, 2006, and week of October 30, 2006 purportedly memorializing
performance issues by Brown prior to Brown's heart attack."  (PAS ¶ 38.)  Hartt admits this fact
"with objection."  Hartt complains that Brown has cited the Maine Human Rights Commission
Investigator's Report (Doc. No. 43-2), which is hearsay and is not admissible evidence as the
record lacks supportive testimony establishing its admissibility.  Brown also cites his own
deposition testimony in support of the statement, but that is to the effect that he believes all of
the "typed up notes" and "documents" are "fraudulent and something that Jeff [Castonguay]
cooked up just to help defend this case."  (Brown Dep. at 178:20-25.)  In a surreply filing in
response to the objection, Brown cites Rule 803(8)(C) of the Federal Rules of Evidence and
supplies an affidavit from his counsel to the effect that the Report was provided to him as
counsel to Brown as part of the administrative process.  (Supplemental Decl. of Jeffrey Neil
Young ¶ 2, Doc. No. 49.)  I overrule the objection and treat the finding as a material fact for
purposes of summary judgment.[7]

Sometime in late 2006, Mr. Castonguay discussed with Mr. Michaud for the first time the
possibility of Michaud becoming Director of Sales at Hartt.  (PAS ¶ 39.)  This conversation

---

[7]     Hartt has not requested summary judgment against the claim that it failed to comply with Section 631 of
the Maine Employment Practices Act.

occurred at a time when Hartt did not know if Brown would be returning to work from his heart attack.  (Id. ¶ 40.)  Mr. Castonguay decided to promote Michaud during Brown's medical leave of absence.  (Id. ¶ 41.)  Hartt acknowledges that Michaud's move to Sales Director was a promotion.  (Id. ¶ 42.)

Hartt announced Mr. Michaud's promotion to some employees in an email dated January 4, 2007, but did not copy Mr. Brown on the email or inform Brown of Michaud's promotion until Brown visited the office on January 15, 2007, and found Michaud at his desk.  In the email announcing Michaud's promotion, Hartt also announced that Ricky Hughes had been transferred from brokerage to the sales department where he would work under Michaud's direction.  (Id. ¶¶ 43, 45.)  At the time of Brown's departure on leave, the Sales Department was composed of two full-time employees, Sales Director Kevin Brown and salesman Dan Michaud, plus a part-time employee, Dick Rideout, who was semi-retired.  (Id. ¶ 46.)

Mr. Brown called in to the office on virtually a daily basis while he was on leave. Although he spoke to Mr. Michaud, Michaud did not mention Michaud's promotion or Brown's demotion.  (Id. ¶ 44.)  On January 15, 2007, Brown stopped in at Hartt to drop off some papers prior to a doctor's appointment and found that Michaud was working in Brown's former office at his former desk, that a second desk was added to the office for Ricky Hughes, and that Brown's personal belongings were in a box in the corner.  (Id. ¶¶ 47-48.)  Michaud informed Brown that Michaud had been promoted and Brown demoted to a salesperson.  (Id. ¶ 49.)  According to Brown, Michaud also indicated that Hughes would be taking Michaud's former position.  (Id. ¶ 51.)  At that time Brown told Michaud that he would not take his position without a court battle. (Id. ¶ 50.)

Later that day, Mr. Brown met with Mr. Castonguay and Castonguay encouraged Brown to remain out on short-term disability benefits.  Brown stated that he might not get a full release to return until February or March.  According to Brown's testimony, Castonguay said that he thought Brown always wanted to retire.  Brown also testified that Castonguay claimed that the changes in the office were for Brown's benefit because they would reduce the stress level if he returned and that Castonguay also stated that, if Brown remained out on short-term disability, Hartt would supplement his income by paying the difference between the STD benefit and his normal salary during that time.  (Id. ¶¶ 52-56.)  Hartt denies that any "restructuring" at the office was motivated by Brown's health needs, "since the decision makers had no idea if Mr. Brown would ever return to work for Hartt."  (DRS ¶ 55.)  During this meeting, Castonguay made no mention of the quality of Brown's work when he explained why Brown was not being restored to his position as Director of Sales.  (PAS ¶ 57.)  Toward the end of their conversation, Brown told Castonguay that Hartt's decision to demote him was illegal.[8]  (Id. ¶ 58;  Brown Dep. at 192, Doc. No. 24-1.)  Brown told Castonguay that he wanted to return to work and Hartt stopped supplementing his short-term disability benefit as of "that day."  (PAS ¶ 60;  Brown Dep. at 192.)  Brown asserts in his Additional Statement that the supplemental payments were discontinued as of the January 15 meeting.  Hartt responds with a qualification stating that the decision to discontinue payments was not causally connected to Brown's desire to return or anything that Brown said about the legality of the changes, without denying that the payments were discontinued as of January 15 (Brown returned to work January 22).  (DRS ¶ 60.)  I interpret this as an acknowledgement that the supplemental payments did not extend past January 15.  As of

---

[8]     I overrule another materiality objection here.

that date, Hartt understood that Brown intended to return to work, but there is no indication that

it knew when he would be cleared to return.  Thus, the summary judgment papers reflect that

Hartt withdrew the supplemental payments for the balance of the January 15 work week, as

Brown did not return to work until January 22.

In a memo concerning the January 15 meeting, Mr. Castonguay wrote:  "We were

hesitant to make Kevin aware of this decision up to today because we were concerned about his

fragile state health wise in also hearing he had another heart attack a few weeks after his

surgery."  (PAS ¶ 59.)

A few days after the January 15 meeting with Mr. Castonguay, Mr. Brown arranged a

meeting with Mr. Hartt.  Brown offers a statement that Hartt told him at the meeting "that Hartt

had lost money like no other time while Brown was out on leave."  (Id. ¶ 61, citing Brown Dep.

196:8-20.)  Hartt denies the statement, citing Mr. Hartt's deposition transcript.  Ordinarily,

Brown's testimony would be credited for summary judgment.  However, Brown's testimony does

not support his summary judgment statement:

> Q.     What do you remember about that meeting?
>
> A.     While I was out they had lost money like no other time.  He told me
> during that meeting that he and Jeff had not been happy with my work
> performance. . . .

(Brown Dep. at 196:19-21.)  At his deposition, Brown asserted that Hartt had lost money during

his absence.  Brown did not testify that Mr. Hartt told him that Hartt had lost money.

Consequently, I do not credit Statement 61.

Hartt would not allow Mr. Brown to return to work until he received an unconditional

release with no restrictions.  (PAS ¶ 62.)  Dr. Bruehl released Brown to return to work on

January 17, 2007.  (Id. ¶ 63.)  Although Dr. Bruehl ostensibly released Mr. Brown with no

restrictions on January 17, 2007, he told Brown that he did not want him to engage in heavy lifting, which was not a requirement of Brown's sales work.  (Id. ¶ 64.)  Dr. Bruehl has characterized Brown as having an elevated risk of sudden death following his heart attacks, including in the time frame of his return to work.  (Id. ¶ 65.)  Upon his return to work, Brown still had to complete a cardiac rehabilitation program that required attendance two to three times per week.  (Id. ¶ 66.)  This physical therapy was ongoing at the time of Brown's termination.  (Id. ¶ 67.)

Upon his return to work, Mr. Brown was situated at Mr. Michaud's former desk in an office outside of where Brown formerly had been located by himself.  This new office space was less private than his former office.  (Id. ¶¶ 69-70.)  As a salesperson, Mr. Brown now reported to Mr. Michaud rather than having supervisory authority over Michaud and the Sales Department.  (Id. ¶ 73.)  Hartt admits that Brown's new job as a salesman was less prestigious than his job as Director.  (Id. ¶ 76.)  Brown no longer was responsible for disciplinary action regarding the Sales Department support staff.  (Id. ¶ 74.)  Brown also had less control over his day to day work.  (Id. ¶ 75.)  The Chevy Avalanche was no longer assigned for his use, but instead he was assigned a less significant Chevy pickup.  (Id. ¶ 77.)

According to Brown, the loss of his former van customers and the requirement that he concentrate his efforts of Hartt's flatbed business (Id. ¶¶ 78-79) was another adverse condition imposed upon his return.  The flatbed business in Maine is mostly seasonal work associated primarily with building and construction products.  (Id. ¶ 80.)  Hartt offers a qualification that the seasonal nature of the business does not mean that there is little for sales personnel to do during the winter season.  (DRS ¶ 80.)  It is undisputed that Hartt's flatbed business was losing money and was underperforming;  that the flatbed portion of the business had not made any money in

20-25 years;  that flatbed business had been discontinued for some 15 years and was only

resumed in 2003;  that Hartt lost $142,648 on flatbed business in 2004, $538,000 in 2005,

$196,574 in 2006, $658,888 in 2007, and $82,855 in 2008;  and that flatbed business at Hartt was

"somewhere near a wash" in 2009.[9]  (PAS ¶¶ 81-89.)

On Mr. Brown's first day back to work, late in the afternoon, Mr. Michaud directed

Brown to prepare a list of lumber yards for potential flatbed customers.  This list was prepared

and Michaud told Brown that he wanted Brown to make calls on the listed lumberyards.

Michaud told Brown that Brown was expected to make 5-6 face-to-face flatbed calls per day.

Before calling on the flatbed prospects, Brown reviewed company files for information that Hartt

already had on hand.  Brown was to have a company vehicle to use for making sales calls and he

had that vehicle available by his third day back.  (Id. ¶¶ 90-97.)  Hartt asserts by way of

qualification that Brown would have needed a few days to "get his act together," do some

preliminary work, and prepare a strategy for his forthcoming sales calls.  (DRS ¶ 97.)

Mr. Brown states that the calls he made the first week back generated new and additional

business for Hartt.  (PAS ¶ 99.)  He cites a portion of Mr. Michaud's continued deposition

transcript that is not particularly helpful in drawing that conclusion and Hartt denies the

statement for that reason.   Mr. Michaud's testimony supports an inference that Mr. Brown's

work in January more likely than not generated some business "activity" the following season.

(Michaud Cont'd Dep. at 19:5-8, 20:16-20, 21:20, 22:10-23:5.)

In an email to Mr. Brown dated January 25, 2007, Mr. Michaud requested that Mr.

Brown provide him with the following information about his sales calls:  shipper name, contact,

---

[9]        I have overruled materiality objections to Additional Statements 81-89.

telephone number, and pricing required for various traffic lanes to secure business; and broker names, contacts, and pricing required to secure business.  (PAS ¶ 100.)  Sales call reports in the record demonstrate that Brown followed the format for the information Michaud requested (PAS ¶ 101), though there is generally no entry for "pricing required for various traffic lanes to secure business."  (See Hartt's Summary Judgment Ex. I, Doc. Nos. 29-4 & 30-1 ("Exs. 74-77").)  Hartt denies the statement for this reason and critiques the quality or usefulness of the information Brown obtained.  (DRS ¶ 101.)

The only discussion that Mr. Castonguay had with Mr. Michaud about Mr. Brown's activities during week two of Brown's return occurred on Friday, February 2, 2007, when Castonguay asked Michaud to obtain information from Brown concerning Brown's activities during the week.  (PAS ¶ 102.)  After Mr. Hartt's discussion with Brown about Hartt's expectations on Brown's first day back at work, Mr. Hartt had no further discussions with Brown about his performance prior to Brown's termination.  (Id. ¶ 106.)  By comparison, prior to the medical leave, Brown had lunch with Castonguay and Hartt virtually daily.[10]  (Id. ¶ 107.)  Brown has testified that Castonguay and Hartt "pretty much" didn't even speak to him anymore and that Michaud and Hughes would decline his inquiries whether they wanted to go to lunch with him.  (Id. ¶ 108.)  For summary judgment purposes, this statement overrides Hartt's denial to the effect that Brown isolated himself.  (DRS ¶ 108.)  Castonguay never spoke to Brown during both the second or third week about Castonguay's purported concerns with Brown's performance.  (PAS ¶ 110.)  Castonguay does not "even think we said hello."  (Castonguay Cont'd Dep. at 279:11-15, Doc. No. 27-3.)

---

[10]   I overrule yet another materiality objection, puzzled as to why it was asserted.

Brown offers a statement to the effect that Hartt closely scrutinized his performance looking for errors after he returned, which repeats a line from his summary judgment affidavit. (PAS ¶ 109.)  Hartt qualifies this statement, cites its own witnesses, and argues that Michaud monitored Brown closely because of Brown's poor demeanor and performance.  (DRS ¶ 110.)

Mr. Brown had a number of "cardio-rehab" appointments scheduled for the week he was terminated.  Mr. Hartt, Mr. Castonguay, and Mr. Michaud were all aware of these appointments.  On Monday, February 12, 2007, at 3:44 PM, Mr. Brown emailed Michaud a report of his activities during the third week of his employment following his return to Hartt. Less than an hour after receiving Brown's report, Michaud told Brown he was terminated. Brown and Michaud were the only two people present when this was communicated.  (PAS ¶¶ 112-115.)  Michaud did not offer any explanation for the termination to Brown other than to say: "We don't need you anymore.  You must have seen this coming."  (Id. ¶ 116.)  Hartt did not give Brown a letter explaining the termination.[11]  (Id. ¶ 117.)

At his deposition, Mr. Brown testified that he anticipated being fired after his return because it "wasn't the first time" he had seen "[s]omeone come back from medical leave and only be around a very short amount of time."  (Brown Dep. at 223:5-12, cited in PAS ¶ 121.)  Mr. Brown offers testimony from a Mr. Peter Freeman, who hauled freight for Hartt for roughly eight years, that is much to the same effect.  (Freeman Dep. at 26, 28-29, 36-38, Doc. No. 43-4, cited in PAS ¶ 122.)  I consider this testimony to be unreliable for purposes of the discriminatory

---

[11]      I overrule another materiality objection here.

motive issue.  Even if the Court accepts as true that some employees separated from employment after returns from medical leave, this evidence is not sufficient to support an inference of illegal conduct on Hartt's part.

Brown also testified about Hartt's termination of a former employee named Darlene Frati who worked in the Sales Department.  According to Brown, Ms. Frati's husband suffered a heart attack and thereafter Mr. Castonguay instructed Brown to "build a file on her" and "put everything in it . . . so I can get rid of her."  (Brown Dep. at 321:23-323:6, cited in PAS 104.) Hartt denies the statement with opposing testimony from Castonguay.  I decline to draw an inference from Brown's deposition testimony that Castonguay's requests began after Frati's husband had a heart attack.  When asked whether Castonguay's request was "somehow related to her husband having the stroke and requiring care," Brown testified:  "I don't know that it was related" and "I'm not sure why he wanted her gone but he wanted her gone."  (Id. at 321:23-322:2.)  Although he need not be certain of Castonguay's intentions in order for this testimony to support a material inference, Brown also could not recollect when Castonguay made the request. (Id. at 323:19-22.)  In this regard, it is not apparent from Brown's deposition testimony that the request did not predate the medical event experienced by Frati's husband.  (Id. at 324:5-6:  "I didn't refuse to do it but as time went on after her husband had a stroke I wouldn't do it.")  If the request predated the medical event, the request would not demonstrate any animus toward an employee with significant family medical issues.

### SUMMARY JUDGMENT STANDARD

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

22

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

### DISCUSSION

Kevin Brown asserts eight counts in his complaint. Hartt Transportation argues that it is entitled to summary judgment as a matter of law against all claims but the last, for reasons discussed below. For purposes of discussion, I group the claims and discuss them in the following order: First, counts IV and VI (the interference/reinstatement claims) and counts V and VII (the retaliation claims) under the Family Medical Leave Act and Maine Family Medical Leave Requirements. Second, counts I and III (the Americans with Disabilities Act and Maine Human Rights Act discrimination claims). Counts II and VIII are not discussed because Brown concedes that summary judgment should enter against Count II (the Rehabilitation Act claim) and Hartt has not requested summary judgment against Count VIII. Based on my review of the record and the applicable legal standards, I conclude that genuine issues of material fact prevent an award of summary judgment on the contested claims.

A.      **Family Medical Leave Claims**

The Family Medical Leave Act prohibits employers from interfering with certain rights guaranteed under the Act.  29 U.S.C. § 2615.  As interpreted by the First Circuit, the prohibitions against "interference" break down into two categories.  The first category involves employee entitlements prescribed by the Act.  It is unlawful for an employer to deny these entitlements to its workers and the employer can be liable for non-compliance, whether or not the employer's non-compliance is motivated by bias against employees who take advantage of their leave rights.  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998).  The second category involves employer conduct specifically proscribed by the Act.  Under this category fall acts by the employer amounting to leave-related discrimination or retaliation.  The Act prohibits employers from discriminating against employees for opposing violations of the Act and prohibits employers from retaliating (or otherwise discriminating) against employees who exercise their leave-related rights.  Id. at 159-60.  Proof of discriminatory animus is necessary with the second category of claims.  Id. at 160.  See also Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330-31 (1st Cir. 2005).

The Maine Family Medical Leave Requirements (MFMLR) are to the same effect.  See 26 M.R.S. §§ 845(1) (requiring "restoration" to an equivalent position upon return from qualifying leave unless "the employer proves that the employee was not restored . . . because of conditions unrelated to the employee's exercise of rights") & 847 (prohibiting "interference or denial" of rights, "discrimination against exercise of rights," and "discrimination against opposition").  I treat the MFMLR claims as coextensive with the FMLA claims, including both the prescriptive and proscriptive categories outlined by the First Circuit in relation to the FMLA.

Mr. Brown advances claims in both categories. For reasons that follow, I conclude that genuine issues of material fact preclude summary judgment in favor of Hartt because a fact finder could reasonably conclude from the evidence that Brown was not restored to an equivalent position following his return from qualifying leave,[12] achieved *persona non grata* status based on his exercise of FMLA and MFMLR rights and opposition to his demotion, and suffered a retaliatory demotion and subsequent discharge based on his exercise of rights and/or opposition to Hartt's failure to honor those rights.

### 1.   *Interference with Family Medical Leave (Counts IV and VI)*

Mr. Brown asserts that Hartt violated the FMLA by failing to reinstate him to the same or equivalent position upon his return from leave. (Opp'n Mem. at 5-6; Compl. Counts IV & VI.) Among the rights prescribed by the FMLA is the right "to be reinstated to the same position or an alternate position with equivalent pay, benefits, and working conditions," upon return from qualifying leave. Hodgens, 144 F.3d at 159 (citing 29 U.S.C. § 2614(a)(1); 29 C.F.R. §§ 825.100(c)). As to this right, "the employer's subjective intent is not relevant" and the issue is "simply" whether the employer provided the entitlement in question. Id. Hartt argues that it is entitled to summary judgment on this claim because Brown was restored to a position with the same pay and benefits and would have been demoted from managing or directing the Sales Department regardless of his medical leave. (Mot. at 5-8.)

Brown easily raises a genuine issue of fact whether he was restored to an equivalent position upon his return from leave. In addition to equal pay and benefits, an equivalent position is one that affords "virtually identical" conditions of employment, "including privileges,

---

[12]        Hartt does not dispute that Brown's leave was qualifying leave under either the FMLA or the MFLMR.

perquisites and status."  29 C.F.R. § 825.215(a).  The record is sufficient to demonstrate that (1) Brown's status was reduced in that he became subordinate to Michaud and subject to Michaud's orders;  (2) both Michaud and a new member of the sales department staff had taken over Michaud's former office;  (3) Brown's involvement with his former sales accounts was reduced as a consequence of directions that he devote essentially all of his time to making sales calls out of the office for an underperforming sector of the business, while the new member of Sales took over Michaud's former duties;  (4) Brown's post-leave company vehicle had reduced status;  and (5) Brown's access to Hartt's general manager and president was essentially *nil* post-leave, whereas pre-leave he would lunch with and have more regular association with them.  Taken together, these changes in Brown's position, status, privileges and perquisites are sufficient to demonstrate that he was not restored to an equivalent position upon his return from leave.  The question is where the claim goes from there.

The FMLA provides that the right to reinstatement, or "restoration," does not entitle a restored employee to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3).  Hartt also cites a regulation to the same effect.  29 C.F.R. § 825.216.  That regulation states that the burden falls on the employer to prove that the right, benefit, or position would have been taken away regardless of leave.  Id. § 825.216(a)(1).  Hartt itself states that it "must show that its decision . . . was finalized before [Brown] . . . commenced FMLA leave or noticed his intent to return."  (Mot. at 7, citing Patterson v. Alltel Info. Servs., Inc., 919 F. Supp. 500, 505 n.9 (D. Me. 1996).)  In support of its bid for summary judgment, Hartt maintains it is undisputed that Brown had performance issues prior to his leave, that Mr. Hartt and Mr. Castonguay perceived Michaud as stronger in several performance areas in

comparison to Brown, and that the decision was made before Hartt and Castonguay knew of Brown's intention to return.  (Mot. at 7-8.)  For reasons set out in the subsequent discussion of Brown's retaliatory/discriminatory discharge claims, I conclude that the record raises genuine issues that preclude judgment on Hartt's defense to the interference claims set out in Counts IV and VI.

### 2.     *Family Medical Leave Discrimination/Retaliation (Counts V and VII)*

To succeed with his FMLA and MFMLR discrimination claims, Brown must demonstrate that Hartt's decisions to demote and fire him were motivated by retaliatory animus arising from his exercise of rights protected by the FMLA and MFMLR.  Colburn, 429 F.3d at 335;  Hodgens, 144 F.3d at 160.  The claims are analyzed in accordance with the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), except where direct evidence of animus is available.  Colburn, 429 F.3d at 335;  Hodgens, 144 F.3d at 160.

The first step in the process requires the plaintiff to demonstrate that he has a prima facie case, which consists of evidence that "(1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action."  Hodgens, 144 F.3d at 161.  Hartt makes passing reference to the prima facie case requirement but does not argue that Brown cannot satisfy it.  My assessment is that Brown easily satisfies the standard.  First, it is undisputed that Brown took qualifying leave.  Second, for reasons discussed in the previous section, Brown was adversely affected by a demotion while he was on leave and by a termination shortly after his return from leave.  Third, and finally, the record permits an inference of a prima facie causal connection because of the close temporal connection between Brown's leave and his demoted status, the imposition of more onerous work

27

conditions following his protests, and the close temporal connection between his protests and his termination.  Calero-Cerezo v. United States DOJ, 355 F.3d 6, 25 (1st Cir. 2004).  Because Brown satisfies his initial burden, Hartt must articulate a legitimate, non-retaliatory justification for its decisions to demote and fire Brown.

As for the decision to demote Brown, Hartt's position is, essentially, that Mr. Castonguay and Mr. Hartt had begun to discuss making Mr. Michaud Director of Sales in May of 2006, prior to Mr. Brown's leave, perceiving Michaud to be the sales employee who did most of the work, but that they did not get around to implementing any related employment actions until Mr. Brown's leave of absence.  In its motion, Hartt cites paragraphs 24, 34-35, and 66 of its Statement of Material Facts.  (Mot. at 10.)  I assume that these record references suffice to carry Hartt's limited burden of production on the demotion decision, although I am somewhat concerned that Hartt did not clearly set forth a "legitimate justification" paragraph in its Statement of Material Facts.[13]  As for the decision to relegate Brown to flatbed calls upon his return, Hartt states that Mr. Castonguay considered Brown to have a special talent for soliciting information from prospective customers.  (DSMF ¶ 65.) As for the decision to terminate Brown, Hartt relies on desultory performance, poor follow through, and failure to follow proper procedure.  (Id. ¶¶ 97-100.)  Hartt satisfies its burden of articulating legitimate explanations for the various adverse actions it imposed on Mr. Brown.  Consequently, the burden returns to Brown, who must now demonstrate that Hartt's justifications are pretexts designed to mask discriminatory or retaliatory animus.  Calero-Cerezo, 355 F.3d at 26;  Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003).

---

[13]      In its motion, for example, Hartt states that "like most private employers, [it] is always searching for greater sales and more productive ways to conduct its business" (Mot. at 10), but there is no clear statement to the effect that Brown's demotion was required in order to achieve a more productive sales department.

Demonstrating pretext in the context of the <u>McDonnell Douglas</u> framework is the customary way of overcoming a summary judgment motion disputing the existence of any discriminatory motive.  This can be done by showing that the movant's stated justifications could be regarded by the fact finder as specious because they are weak, implausible, inconsistent and contradictory, or perhaps even incoherent.  <u>Hodgens</u>, 144 F.3d at 168.  Evidence of close temporal proximity between two events is also probative of a causal connection.  <u>Id.</u> Additionally, the historical background to a decision (or lack thereof), the use of a particular evaluative process, contemporaneous statements by decision makers, and evidence of unfairness can all be called upon to help raise an issue as to the existence of discriminatory motive.  <u>Id.</u> at 168-69.

Brown raises a genuine issue as to the existence of retaliatory and discriminatory animus with his combined factual presentation.  At the foundation of this presentation is a very strong temporal proximity.  Added to this are facts that call into question Hartt's assertion that demotion was inevitable.  Hartt states that the intention to demote Brown or promote Michaud was forming in June of 2006, but the evidence would permit findings that Mr. Castonguay spoke positively of company profitability with Brown at that time, that no significant performance issues were raised with Brown at that time or previously, and that Michaud did not complain about unfair workloads subsequent to June 2006.  Moreover, in its Statement, Hartt attempts to create the impression that Brown and Michaud were really a team of relative equals, yet if that was so, it begs the question why Hartt was so determined to place Brown under Michaud's constant supervision upon his return and why Hartt tasked Brown with making sales calls almost entirely devoted to flatbed freight, an underperforming sector of its business, during the off season, while grooming a new-comer to the Department to assume Michaud's accounts or former duties.  On

top of these circumstances, Hartt never offers a statement, supported by the testimony of its decision makers, to the effect that it was reasonable to instruct Brown to make 5 or 6 face-to-face sales calls per day while trying to schedule roughly 25 more for the following week.  Hartt merely relates that Brown was instructed to do so and that Brown thought the assignment was unreasonable.  (DSMF ¶¶ 83, 93.)  This aspect of the record supports an inference that the assignment was unreasonable.  A reasonable fact finder could regard these changes in Brown's work conditions as retaliatory or discriminatory measures and not merely the inevitable realignment of personnel to maximize workplace efficiencies or to recognize the relative merit of Brown and Michaud, as proposed by Hartt.  Mr. Castonguay's and Mr. Hartt's refusal to talk with Mr. Brown upon his return and the exclusion of Mr. Brown from lunch outings only reinforces such a finding.  Castonguay's failure to explain the demotion to Brown on January 15 in terms of Brown's alleged performance issues further calls into question the stated justification.[14]  In combination, these several items of circumstantial evidence are sufficient to permit the finder of fact to reject Hartt's justifications and to conclude that Brown's standing at Hartt fell precipitously following his heart attack precisely because of his medical condition and/or exercise of FMLA rights and that he was set up to fail upon his return, in very short order, for the same reason.[15]

---

[14]    The record reflects that Mr. Hartt raised these issues a few days after the January 15 meeting between Mr. Brown and Mr. Castonguay.  However, that also means that Mr. Hartt made the statements only after Brown had expressed that he intended to return to work and had told Castonguay that his demotion was illegal.  Brown's cause is also advanced by the circumstantial evidence of back-dated memoranda concerning his performance problems.

[15]    Hartt argues that this case is like Dressler v. Community Service Communications, Inc., in which the First Circuit affirmed a summary judgment decision that the record was so one-sided in favor of the employer that no reasonable juror could find for the plaintiff.  275 F. Supp. 2d 17, 25 (D. Me. 2003), aff'd, 115 Fed. Appx 452, 453-54 (1st Cir. 2004).  The record in this case bears little resemblance to the record in Dressler.

**B.      Disability Discrimination**

Hartt also seeks summary judgment in its favor on Brown's claims of disability

discrimination under the Americans with Disabilities Act (ADA) and the Maine Human Rights

Act (MHRA).  Hartt contends that Brown's claim must fail because he was not "substantially

limited in any major life activity during the time period relevant to the two alleged acts of

discrimination." (Mot. at 17.)  Otherwise, Hartt contends that the record is not sufficient to

demonstrate that these adverse employment actions were motivated by discriminatory animus

toward the disabled.  (Id. at 18.)  These challenges pertain to distinct aspects of the McDonnell

Douglas framework as applied in the context of disability discrimination.

The ADA prohibits discrimination against "a qualified individual with a disability

because of the disability of such individual in regard to . . . terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a).  The MHRA provides analogous protection.  It, too,

prohibits discrimination against qualified individuals with disabilities in regard to, among other

things, discharge and the terms, conditions and privileges of employment.  5 M.R.S. § 4572(2).

It is appropriate to analyze both claims "hand in hand," following the McDonnell Douglas rubric.

Carmichael v. Verso Paper, ___ F. Supp. 2d ___, ___, CV-08-402-B-W, 2010 WL 27725, *7,

2010 U.S. Dist. Lexis 934, *22 (D. Me. 2010) (citing Soileau v. Guilford of Me., Inc., 105 F.3d

12, 14 (1st Cir. 1997) (quoting Winston v. Me. Tech. Coll. Sys., 631 A.2d 70, 74 (Me. 1993)).[16]

---

[16]      For claims arising from events prior to June 21, 2007, it is sometimes necessary to consider whether a
qualifying disability existed under Maine law, but not under federal law, because the MHRA definition of disability
was considerably broader than the one found in the ADA.  Rooney v. Sprague Energy Corp., 519 F. Supp. 2d 131,
133-34 (D. Me. 2007)(involving claim filed before effective date of MHRA amendment);  Swift v. Bank of Am.,
Civ. No. 08-35-B-W, 2009 WL 723521, *12, 2009 U.S. Dist. Lexis 22499, *37-38 (D. Me. Mar. 16, 2009) (Mag. J.,
Rec. Dec.) (involving claim that accrued prior to effective date of amendment).  Even subsequent to June 21, 2007,
it is sometimes necessary to consider specific impairments as qualifying disabilities under the MHRA, though not
necessarily under the ADA.  See 5 M.R.S. § 4553-A (identifying certain impairments as disabilities "[w]ithout
regard to severity unless otherwise indicated," including "heart disease").

### 1. **Prima Facie** *Disability Discrimination*

To establish a prima facie case under the ADA and MHRA, Mr. Brown must demonstrate (1) that he was disabled within the meaning of the Acts;  (2) that with or without reasonable accommodation, he was qualified to perform the essential functions of his job;  and (3) that Hartt demoted and/or discharged him because of, in whole or in part, his disability.  Thornton v. UPS, Inc., 587 F.3d 27, 34 (1st Cir. 2009).  Hartt's summary judgment motion focuses on the first element of the prima facie test.[17]  Hartt observes that Brown was cleared to return to work and that there were no restrictions suggesting he suffered from a substantial impairment.  (Mot. at 16-17.)  Based on this development, Hartt says that Brown categorically cannot qualify as disabled.  (Id. at 17-18.)  Should the Court conclude that Brown has a prima facie case, Hartt argues that Brown fails to raise a genuine issue on the ultimate issue of discriminatory motive.  (Id. at 18.)  I conclude that Brown has made a sufficient prima facie showing under both the ADA and the MHRA and that there is enough circumstantial evidence in the record to raise a jury question on the existence of discriminatory motive.

### a.     *Brown qualifies as disabled for purposes of the MHRA*

Before addressing whether Brown qualified as disabled under the ADA, it is clear that Brown raises a genuine issue whether he qualified as disabled under the MHRA.  When his claim accrued, the MHRA extended disability protection for "any . . . infirmity . . . caused by . . . disease, . . . environmental conditions or illness."  Whitney v. Wal-Mart Stores, Inc., 2006 ME

---

[17]     Hartt argues that the record does not suggest discriminatory motive, either, but that argument is made in relation to the ultimate issue, not in relation to prima facie causation.  The prima facie standard sets a "relatively light burden" and both the temporal proximity between Brown's heart attacks and his demotion and the temporal proximity between his return from heart-attack related leave and his termination are sufficient to satisfy the third element, particularly when combined with the suggestion that he remain out on disability leave and the later insistence on a full release.  Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007).

37, ¶ 24, 895 A.2d 309, 315 (quoting Rozanski v. A-P-A Transp., 512 A.2d 335, 340 (Me. 1986),

and 5 M.R.S.A. § 4553(7-A) (1979)).  Brown's heart attacks, which required quintuple bypass

surgery and two angioplasties, demonstrate a qualifying disability for purposes of Maine law.

> **b.**     *Brown fails to demonstrate a substantial limitation of permanent*
> *or long-term duration*

A qualifying disability under the ADA is defined as an impairment that "substantially

limits" an individual's ability to engage in one or more "major life activities."  42 U.S.C. §

12102(2) (2005).[18]  Brown obviously suffered a significant impairment in his cardiovascular

system when he suffered heart attacks in late 2006.  For purposes of federal law, the question is

whether Brown's heart attacks reflected or resulted in a substantial limitation in Brown's ability

to perform a major life activity.  The Equal Employment Opportunity Commission has defined

"substantially limits" as:

> (i)  Unable to perform a major life activity that the average person in the general
> population can perform;  or
>
> (ii)  Significantly restricted as to the condition, manner, or duration under which
> an individual can perform a major life activity as compared to the condition,
> manner, or duration under which the average person in the general population can
> perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  The EEOC prescribes the following factors to determine whether an

individual is substantially limited in a major life activity:

> (i)  The nature and severity of the impairment;
>
> (ii)  The duration or expected duration of the impairment;  and

---

[18]     Congress recently amended Section 12102 of the ADA.  ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  The new language retains the "substantially limits" and "major life activities" terminology, but now includes some supplemental definitions and rules of construction that widen the class of covered individuals.  42 U.S.C. § 12102 (Supp. 2009).  The amendments are not retroactive and, therefore, do not impact the analysis in this case.  Carreras v. Sajo, 596 F.3d 25, 33 n.7 (1st Cir. 2010).

(iii)  The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).  In Toyota Motor Manufacturing v. Williams, 534 U.S. 184 (2002), the Supreme Court reified the "permanent or long term" regulation, treating it as inherent in the idea of substantial limitation.  Id. at 198.  Consequently, where there are "large potential differences in the severity and duration of the effect" of an impairment, a "diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the ADA."  Id. at 199.

Because Mr. Brown's ADA claim arose in 2007, his impairment must not only be long term, it must also be substantially limiting despite the impact of mitigating measures taken to restore his health.  Sutton v. United Air Lines, 527 U.S. 471, 482-83 (1999), superceded by statute, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008);  Carreras v. Sajo, 596 F.3d 25, 33 (1st Cir. 2010).  Thus, Mr. Brown's cardiovascular functioning would need to be assessed in light of his quintuple bypass surgery and angioplasty procedures.

Mr. Brown maintains that as of January 4, 2007, when the decision was made to demote him, he had been through three procedures and been hospitalized three times, and "was suffering a severe impairment of indeterminate duration that had, potentially, permanent long-term impact."  (Opp'n Mem. at 15.)  At that time, Brown had been out on leave for two months and believed he might be out of work for more than two additional months.  (Id.)  In addition to these considerations, Brown has introduced evidence that his physician opines that Brown had an elevated risk of sudden death following his heart attacks, including in the time frame of his return to work.  (PAS ¶ 65.)  Moreover, at the time, Brown still had to complete a cardiac rehabilitation program that required attendance two to three times per week.  (Id. ¶ 66.)  Brown was still participating in this program when Hartt terminated him.  (Id. ¶ 67.)  On top of this

34

evidence, Hartt itself had indicated that its decision makers, as of January 4, "had no idea if Mr. Brown would ever return to work for Hartt."  (DRS ¶ 55)

Because of the exacting phraseology that developed in this area of the law, it is actually difficult to find that two heart attacks, quintuple bypass surgery, and two angioplasties raise a genuine issue as to the existence of a substantially limiting cardiovascular disability.  For example, in Katz v. City Metal Co., the First Circuit recognized that "a rational jury could conclude, even without expert medical testimony," that a heart attack reflects a physical impairment of the cardiovascular system.  87 F.3d 26, 31 (1st Cir. 1996).  However, the First Circuit also stated that it presented "a very close question" whether a cardiac event that resulted in a period of convalescence involving shortness of breath and a significant limitation in the ability to walk satisfied the substantial limitation standard.  In the Court's words:

> We think that it would be difficult for a lay jury to conclude, based solely on the immediate effects of a heart attack and angioplasty procedure on Katz, that those limitations were permanent or persisted on a long-term basis, or that their duration was indefinite and unknowable or expected to be at least several months.

Id. at 32.  The same would have to be said of this case, as the record lacks evidence of any physical limitations on the order of what was experienced by the plaintiff in Katz.  In another, more recent opinion, the First Circuit indicated that it would be difficult to determine whether any temporary infirmity involving a period of convalescence of only 6 to 24 months could satisfy the "permanent or long-term requirement" of the ADA, as it was construed at the time of Brown's impairment.  Guzman-Rosario v. UPS, 397 F.3d 6, 10 (1st Cir. 2005) (involving ovarian cysts that required surgery and brief hospitalization).  In Guzman-Rosario, the First Circuit ultimately decided to resolve a summary judgment dispute based on the absence of evidence of a substantial limitation on a life activity of *any* duration.  Id. at 10-11 (involving intermittent

dizziness and pain).  That escape hatch does not as easily open here.  Two heart attacks and

quintuple bypass reflect a severe impairment of cardiovascular function that can be expected to

severely disrupt anyone's life activities for a spell.  The issue here is, squarely, the duration of

such impairment.  On balance, I conclude that the facts of the instant case are not sufficient to

place Brown in the category of "disabled" under the ADA, as the term was construed at the time,

because his impairment, though severe, was not of long enough duration.

       c.     *Brown fails to demonstrate a record of a substantial limitation of permanent or long-term duration*

Brown argues, in the alternative, that he qualifies as disabled under the ADA because he

had a record of being disabled and/or because Hartt regarded him as disabled.  The ADA extends

its protection to those who are discriminated against based on a record of a qualifying disability

or based on a mistaken perception that they suffer from a qualifying disability.  42 U.S.C. §

12102(2)(B), (C) (2005).  To come within either of these categories, Brown must show that he

had a record of, or was regarded as having, an impairment that substantially limited one or more

life activities.  Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 83 (1st Cir. 2008).  The

limitation would also have to be permanent or long term.[19]  Katz, 87 F.3d at 32;  Guzman-

Rosario, 397 F.3d at 10.  For reasons already indicated, the summary judgment record does not

support a finding that Brown had a record of a permanent of long-term limitation when he

returned to work at Hartt.

Brown argues that he has a record of a qualifying disability because his treatment

required hospitalization, citing School Board of Nassau County v. Arline, 480 U.S. 273 (1987).

(Opp'n Mem. at 16.)  In Arline, the Supreme Court held that acute tuberculosis requiring

---

[19]      The "regarded as" provision has been reworded by the ADA Amendments Act of 2008 and is now broader in scope.  42 U.S.C. § 12102(3) (Supp. 2009).

hospitalization demonstrated a record of a substantially limiting impairment of respiratory function.  Id. at 281.  However, Arline was decided prior to Williams, where the Supreme Court held that an "impairment's impact must also be permanent or long-term."  534 U.S. at 198.  This is not to say that Williams overruled Arline, but the hospitalization in Arline lasted in excess of one year.  Arline v. Sch. Bd. of Nassau County, 692 F. Supp. 1286, 1289 (M.D. Fla. 1988) ("Plaintiff was hospitalized for tuberculosis from May of 1957 until August of 1958.")  Arline, in other words, does not reflect that any period of hospitalization requires a finding that a plaintiff has a record of a substantially limiting impairment.  Even prior to the Williams decision, courts were refusing to treat a brief period of hospitalization as establishing a record of a qualifying disability.  Bilodeau v. Mega Indus., 50 F. Supp. 2d 27, 37 (D. Me. 1999) ("This Court agrees with the decisions of the Courts of Appeal for the Sixth, Seventh and Eighth Circuits that a hospitalization for an impairment does not in and of itself establish a record of such disability.") (collecting cases).  This Court has more recently denied summary judgment to an employer based on a "record of" claim, where the plaintiff was twice hospitalized for the same impairment (depression and resulting suicide attempts).  However, those hospitalizations occurred more than a decade apart, which would suggest a long-term impairment.  Trafton v. Sunbury Primary Care, P.A., ___ F. Supp. 2d ___, ___, CV-08-322-B-W, 2010 WL 675058, *7, 2010 U.S. Dist. Lexis 17182, *23-24 (D. Me. 2010).

> d.      *Brown succeeds in demonstrating that he was regarded as having*
> *a substantial limitation of long-term duration*

The purpose of the "regarded as" provision "is to protect impaired individuals from discrimination on the part of their employers who exclude such individuals because of the stereotypes, myths, and fears they hold of people who are so impaired."  Bilodeau, 50 F. Supp.

2d at 38.  A person is regarded as having a qualifying disability where:  "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Sutton, 527 U.S. at 489. Brown argues that Hartt regarded him as having a qualifying disability.  He bases his argument on the following facts:

> That he was told changes in the office were designed to make it less stressful for him;
>
> That Castonguay indicated Brown was not informed of these changes initially because of concern for his fragile health;
>
> That Castonguay suggested to Brown that he remain out on disability leave;  and
>
> That Hartt demanded a full release before Brown would be permitted to return.

(Opp'n Mem. at 17-19.)  In addition to these facts, I note that Hartt itself has indicated it did not know whether Brown would ever return to work.  (DRS ¶ 55.)  These facts, plus the circumstantial evidence of pretext, are sufficient to support an inference that Hartt regarded Brown as having an impairment of sufficient duration to meet the Williams "permanent or long-term" requirement, which is the only factor otherwise preventing Brown from establishing a *prima facie* case of a qualifying disability or record of a qualifying disability.

> ### e.    Pretext

The discussion of pretext set forth above, in the context of the FMLA and MFMLR claims, applies with equal force here.  Viewing all of the evidence in the record in the light most favorable to Brown and drawing all reasonable inferences in his favor, the finder of fact could fairly conclude that Hartt discriminated against Brown in regard to the terms, conditions, and privileges of employment based on an actual (MHRA) or perceived (ADA) disability.

**CONCLUSION**

Based on the foregoing recitation of material facts and discussion of the law, I

RECOMMEND that the Court GRANT Defendant's Motion for Summary Judgment (Doc. No.

22) solely as to Count II (Rehabilitation Act) and otherwise DENY the Motion.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 28, 2010